**FILED**
**Mar 13, 2019**
**03:33 PM(CT)**
**TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT JACKSON

| | | |
|---|---|---|
| **MICHAEL FERRELL,** | ) | **Docket No. 2017-07-0828** |
| **Employee,** | ) | |
| **v.** | ) | |
| **WADE NORRIS LOGGING, LLC,** | ) | **State File No. 56416-2015** |
| **Employer,** | ) | |
| **And** | ) | |
| **FORESTRY MUTUAL INS. CO.** | ) | **Judge Amber E. Luttrell** |
| **Carrier.** | ) | |

## COMPENSATION HEARING ORDER GRANTING BENEFITS

The Court held a Compensation Hearing on February 7, 2019, on Mr. Ferrell's claim for workers' compensation benefits for alleged injuries to his neck, back, and inner ear. Wade Norris Logging (WNL) accepted compensability for Mr. Ferrell's neck and inner ear injuries but denied his back claim. The legal issues included: 1) whether Mr. Ferrell sustained a compensable back injury, 2) the degree of permanent impairment for all injuries, 3) the proper compensation rate, 4) additional temporary disability benefits (TTD) and past medical expenses, 5) permanent total or permanent partial disability or permanent partial with increased benefits, and 6) discretionary costs.

For the reasons below, the Court 1) holds that Mr. Ferrell's back injury is compensable; 2) finds a total permanent impairment of thirteen percent to the body as a whole; 3) finds a compensation rate of $439.10; 4) awards TTD benefits of $13,986.76 and past medical expenses; 5) awards permanent partial disability benefits totaling $25,687.35, and 6) awards discretionary costs of $1,596.60, along with future medical benefits.

### History of Claim
*Stipulations*

The parties' stipulated facts are summarized as follows: Mr. Ferrell is a fifty-nine year old resident of Henderson County, Tennessee. He completed the tenth grade and obtained a GED.

On July 11, 2015, Mr. Ferrell sustained injuries in a work-related truck wreck. WNL accepted the claim and provided medical treatment with Dr. John Brophy for a neck injury. Mr. Ferrell reached maximum medical improvement (MMI) for the neck injury on July 28, 2016. He received authorized treatment from Dr. Christopher Hall for an inner-ear injury and reached MMI for that injury on February 13, 2017.

WNL denied Mr. Ferrell's alleged back injury, so he sought treatment from Dr. Raymond Gardocki and reached MMI for his back on February 20, 2018. He did not return to work for WNL or any other employer.

Mr. Ferrell received TTD benefits for eighty-four weeks through February 13, 2017, at the compensation rate of $402.23. WNL paid advance permanent benefits in the amount of $2,585.90, for which WNL is entitled to a credit against any award.

*Trial Testimony*

Mr. Ferrell testified to his job history before working as a log-truck driver for WNL. Besides commercial truck driving, he worked as a carpet installer, owner of a convenience store, computer technician, and as a manager/safety compliance officer for a trucking company. He also ran a trucking business where he was the owner/operator of a truck.

Mr. Ferrell described his past carpet-installation work as "extremely physical." His work at his family-owned convenience store involved some physical work, including lifting, sweeping, and mopping. He also purchased products and maintained inventory. Regarding his computer work, Mr. Ferrell is self-taught on computers, worked in a computer store, and performed some freelance work on computers. He has no certification or formal computer training. He worked an office-job as a manager for a trucking company, which involved managing loads and drivers, doing paperwork, maintaining the drivers' DOT certifications, and dispatching drivers and loads. Also at that job, he served as a safety compliance officer, which involved conducting safety training meetings for drivers and making sure drivers were complying with DOT regulations.

Turning to his work injury, Mr. Ferrell testified that as he drove on a curvy road, he noticed a car crossing over into his lane. He jerked the wheel to the right to avoid an accident, drove off the roadway, and his truck overturned. Mr. Ferrell alleged injuries to his neck, back, and inner ear resulting from the accident. He had no prior problems with his neck or inner ear but did have a prior back injury and surgery at L5-S1 in the early nineties. He had no subsequent problems with his back beyond general aches and pains until the work injury.

The trauma of the wreck rendered Mr. Ferrell unconscious, and when he awoke,

2

he found himself hanging by the seatbelt between the driver and passenger seats. He got out of the truck and immediately called his employer and his wife. He did not call an ambulance; however, one arrived from Bolivar-Hardeman County Ambulance Service. Mr. Ferrell allowed the first responder to look at him but declined the ambulance ride because he did not want to go to Bolivar Hospital. His location was closer to Jackson, and he preferred his wife take him to Jackson-Madison County General Hospital. Mr. Ferrell later received a $300 bill from the ambulance service and requested WNL satisfy the bill. WNL terminated Mr. Ferrell shortly after the injury.

Following his medical treatment, detailed below, Mr. Ferrell testified he still experiences pain and tingling in his left arm from his neck injury. He stated his back surgery helped his left leg pain, but he still experiences "a little" pain now. He described residual pain in his back, trouble sitting or standing, and ongoing dizziness. While not prescribed by a doctor, he walks with a cane to help his balance and to take weight off his left leg. Mr. Ferrell's adult son currently lives with him and assists with cooking and cleaning. His son also takes care of bush-hogging his farm. Mr. Ferrell stated he tries not to drive much.

Due to his ongoing symptoms, Mr. Ferrell did not renew his commercial driver's license because he could not pass the physical. He testified he is currently unable to sit for long periods of time and experiences dizziness. He testified both of these issues would hinder his ability to work. He stated he cannot perform past jobs with his dizziness, his inability to sit, or the physical demands of the jobs. He admitted he has not applied for any other employment and knows of no other work for which he is qualified. He currently seeks treatment at the VA for pain management and his preexisting anxiety and depression. He takes Seroquel, an anti-depressant; Xanax, for anxiety; and Vicodin for pain.

Regarding the compensation rate, Mr. Ferrell testified he disagreed with WNL's wage statement calculation. WNL divided the total wages of $3,016.75 reflected on the wage statement by five weeks, which provided an average weekly wage of $603.35 and compensation rate of $402.23. WNL paid Mr. Ferrell's TTD at this rate. Mr. Ferrell argued this was not an accurate or fair reflection of his wages because he did not work five full weeks. He stated he only worked one day the first week because it was the end of a pay period. He agreed with including weeks two and three. However, he only worked one day on week-four because they were rained out the rest of the week, and he only worked two full days in week-six before he was injured on the third day.

Mr. Ferrell further testified regarding WNL's wage statements from his former coworkers, Larry Adkisson and Greg Rainey, whom WNL considered similar employees. Mr. Ferrell agreed Mr. Rainey was a similar employee. However, he disagreed that Mr. Adkisson's wages were similar because Mr. Adkisson was drawing Social Security Retirement, so he limited his work hours to not impact his retirement benefits. Mr.

3

Norris, owner of Wade Norris Logging, also testified on this issue and agreed that Mr. Rainey was more comparable to Mr. Ferrell than Mr. Adkisson.

*Medical Treatment and Physicians' Testimony*
*a. Neck injury*

The parties stipulated Mr. Ferrell sustained a compensable neck injury. Thus, the disputed issue was the degree of permanent impairment. The parties introduced the depositions of Dr. Brophy, his treating physician, and Dr. Chung, his IME physician, regarding the competing ratings.

*Dr. Brophy*

Mr. Ferrell saw Dr. Brophy around three weeks after his injury. Regarding his neck, Mr. Ferrell reported symptoms to Dr. Brophy of left neck and trapezius pain that extended to the scapula. After Mr. Ferrell's cervical symptoms persisted, Dr. Brophy ordered a MRI, which demonstrated a broad based left C5-6 HNP associated with some osteophyte and cord compression with significant narrowing of the left C6 foramen and signal changes in the cord. He recommended surgery.

Dr. Brophy performed a C5-6 anterior cervical discectomy and fusion on May 3, 2016. He testified Mr. Ferrell improved following surgery and ordered a work conditioning program. Following work-conditioning, Mr. Ferrell reported his neck pain had not improved significantly. Dr. Brophy stated his upper extremity strength was normal and sensory light touch was intact. As of July 27, 2016, Dr. Brophy concluded Mr. Ferrell's cervical radiculopathy had resolved. Specifically, he no longer had arm pain or numbness and his strength remained normal. Dr. Brophy testified from a neurosurgical standpoint that Mr. Ferrell reached MMI and could return to work at full duty without restriction on July 28, 2016. Dr. Brophy assigned no permanent restrictions. During his treatment, Dr. Brophy testified Mr. Ferrell extensively discussed his computer skills, his activities writing programs at home, and his plans to attend an advanced computer course or seek future work in computers.

Several months later, Mr. Ferrell returned to Dr. Brophy with new symptoms of parasthesias in the fourth and fifth fingers of his left hand. Dr. Brophy stated his symptoms came from a different level of the neck and were unrelated to Mr. Ferrell's cervical injury. Regarding his work injury, Dr. Brophy found Mr. Ferrell did not describe any recurrent left upper extremity radicular pain.

Regarding impairment, Dr. Brophy assigned a six-percent permanent impairment to the body for the neck injury.[1] He used the diagnosis-based impairment method in Table 17-2 on p. 564 of the AMA Guides. He selected Class 1 for a diagnosis of an

---

[1] Every physician testified he utilized the Sixth Edition of the AMA Guides to assign impairment.

4

intervertebral disc herniation at a single level with documented findings. Class 1 requires documented *resolved* radiculopathy or *nonverifiable* radicular complaints at the clinically appropriate level. (emphasis added). After applying the grade modifiers, the result was a Class 1, Grade C, six-percent impairment. Dr. Brophy explained Mr. Ferrell qualified for Class 1 impairment because he had no weakness and no numbness at his last evaluation.

On cross examination, counsel questioned Dr. Brophy further regarding the basis for his assignment of Class 1 versus Class 2 impairment. Dr. Brophy explained the difference between Class 1 and Class 2 impairment is whether there is any residual radiculopathy at the clinically appropriate level present at the time of the exam. Dr. Brophy found Mr. Ferrell's radiculopathy had resolved. He stated, "The only way it could continue at C5-6 would be if there was a nonunion, . . . which would be a significant issue, and the usual manifestation of that would be other symptoms other than radiculopathy." Dr. Brophy further explained, "If he had weakness in a C6 distribution, that would put him in class two; but he never had that pre-op, never had it post-op, and anybody that found it would be warranted to do further imaging to explain it if he really thought it was real."

Dr. Brophy disagreed with Dr. Chung's reported exam findings, assessment of Class 2 impairment, and activity recommendations. Regarding Dr. Chung's exam findings supporting his Class 2 assessment, Dr. Brophy stated, "He considered a positive Spurling sign on the left side of the neck which is subjective, decreased reflexes, which I did not find except they were symmetric, sensory loss in the specific left cervical dermatome, which he did not have when I last saw him." Further, Dr. Brophy disagreed with Dr. Chung's finding of motor deficits and stated after months of treatment, he never found weakness. He stated, "If he's finding motor deficits months later, if that's true, why wasn't further imaging recommended, because that would be a new and serious potential medical condition unrelated to his C5-6 if he's got grip strength weakness." (Dr. Brophy deposition, p.42-43).

Dr. Brophy further disagreed with Dr. Chung's recommendations that Mr. Ferrell avoid overhead work, work away from the body, and work requiring repetitive flexion, extension, and rotation of the neck. He stated, "If in the Army I could send soldiers back to jump status with the 82nd Airborne Division with this operation, why can he not do these things? We send Navy pilots back to flight status on their F18s." *Id.*

*Dr. Chung*

Dr. Chung evaluated Mr. Ferrell regarding his neck injury only. Mr. Ferrell reported continued pain radiating into his left upper trapezius muscle into the subscapular area and some numbness and tingling into his left lateral arm. He stated the intensity of the shooting pain had improved since surgery, but his overall pain in the posterior neck and cervical motion had worsened since surgery. He described weakness and inability to

grip using his left hand. Dr. Chung testified his complaints of pain radiating into the trapezius muscle and numbness and tingling in his left arm indicated some residual symptoms of radiculopathy.

Regarding impairment, Dr. Chung utilized Table 17-2 and assigned a Class 2, Grade C impairment rating of eleven percent to the body. Dr. Chung stated the basis for assigning a Class 2 impairment rating was that Mr. Ferrell had long-term residual symptoms of radiculopathy that continued after MMI. He stated, "That's the main reason I put him in Class 2." In support of his rating, Dr. Chung noted his finding of a positive Spurling sign on the left, changes in reflex, absence of the brachioradialis reflex, and slight decrease in tricep reflex and sensory loss of the C6 dermatome. He further stated Mr. Ferrell had vague weakness in the wrist extensor and slightly weaker grip strength based on gross assessment by asking him to squeeze his hand.

Dr. Chung testified that as an evaluating physician, he does not assign permanent restrictions. Instead, he suggested activity recommendations. Regarding his work, Dr. Chung testified he did not think Mr. Ferrell could return to truck-driving after his neck and back surgeries. He knew Mr. Ferrell had a back surgery in the nineties and back surgery following this injury but acknowledged he did not know the outcome of the surgery or how he is doing with his back. Nevertheless, he stated Mr. Ferrell could not do "physical kind of work" because of his back condition and neck symptoms. On cross examination, Dr. Chung acknowledged his opinions regarding Mr. Ferrell's physical abilities with his back and specific job duties at WNL were speculative.

### b. Inner-ear injury

The parties stipulated Mr. Ferrell sustained a compensable inner-ear vestibular injury. Thus, the disputed issue was the degree of permanent impairment. The parties introduced the depositions of Dr. Christopher Hall, his treating physician, and Dr. Karl Studtmann, his IME physician, regarding the competing ratings. Both physicians are ear, nose and throat specialists.

### Dr. Hall

Mr. Ferrell saw Dr. Hall after a direct referral from Dr. Brophy for evaluation and treatment of dizziness. On exam, Dr. Hall found "left gaze end point nystagmus." He explained that "nystagmus" is "when you try to fix your gaze on a point and the eyes continue to beat. They don't hold still." Dr. Hall stated it is a manifestation of a vestibular (inner-ear) problem. He subsequently ordered tests for positional vertigo and to measure nerve signals and function in the inner ear, which were all normal. Mr. Ferrell's only abnormal test was a VNG test, which is used to unmask other nystagmus and measure function of the inner ear. Dr. Hall stated the initial VNG demonstrated weakness in the right ear, which he associated with Mr. Ferrell's injury based on his reported history. Dr. Hall recommended vestibular rehabilitation with physical therapy and restricted Mr.

6

Ferrell from commercial driving until a follow-up appointment.

Dr. Hall ordered follow-up testing at subsequent visits, which indicated an improvement in Mr. Ferrell's original vestibular weakness. Dr. Hall testified the right ear vestibular condition that he related to the work injury "seems to have been a temporary weakness in the vestibular system." Months later, Mr. Ferrell returned to Dr. Hall, in July 2016, still complaining of dizziness. Dr. Hall ordered more tests, which were normal. His only somewhat abnormal test was a sensory organization testing, but Dr. Hall noted it was likely due to his herniated disc, low back pain, and inability to put weight on his left leg.

Mr. Ferrell last saw Dr. Hall on February 13, 2017. Notably, Dr. Hall performed a repeat VNG test, which was normal. He concluded Mr. Ferrell had normal vestibular function, and he could find no objective findings to support his ongoing reported symptoms of dizziness. He stated, "Strictly from the vestibular standpoint, . . . his previous injury had improved and resolved and he had no lasting defect."

Regarding impairment, Dr. Hall utilized the vestibular injury section, Table 11-4, and assigned a zero-percent impairment based on Class 0. He explained that Class 0 requires a history of symptoms of vestibular equilibrium but without objective findings, no confirmable findings on physical exam, and no confirmable diagnostic findings. Dr. Hall assigned no permanent restrictions and stated from a vestibular standpoint, he could return to work.

Additionally Dr. Hall commented on Dr. Studtmann's impairment rating. Dr. Hall reviewed Class 2, which Dr. Studtmann utilized to rate Mr. Ferrell in his independent medical evaluation (IME). He testified regarding the required findings for Class 2, which includes an abnormal VNG test. Dr. Hall stated that Mr. Ferrell's only abnormal VNG test was his initial one. He had two subsequent normal VNG tests.

On cross examination, Dr. Hall agreed he had not seen Mr. Ferrell since he released him and did not know how he is doing now. Mr. Ferrell's counsel asked Dr. Hall to assume that he still reports dizziness, uses a cane, falls, and no longer drives. He then asked him if those things could adversely affect his ability to work. Dr. Hall responded, "Those things, yes, they could, and in my assessment, I did not say that he could work from any standpoint. I just said from the vestibular standpoint that I did not see any objective findings . . . and that I felt like, vestibular-wise, he had reached maximum medical improvement."

*Dr. Studtmann*

Mr. Ferrell saw Dr. Studtmann for an IME and provided a history of his accident and reported dizziness following the accident. Dr. Studtmann testified he only reviewed Dr. Hall's records for this IME. On exam, Mr. Ferrell was unable to perform evaluations

7

such as the gait assessment or tandem walk due to his use of a cane. Dr. Studtmann stated the remainder of his evaluation did not show any obvious abnormality. He diagnosed multifactorial dizziness. He concluded a portion of his problem was related to his lower extremity dysfunction from his back injury but stated he had a peripheral problem based on the initial abnormal VNG and a central problem affecting his dizziness. Dr. Studtmann causally related his problem to the work injury.

Regarding impairment, Dr. Studtmann also utilized Table 11-4 but selected a Class 2 vestibular disorder and assigned twenty-percent impairment to the body. He explained that Mr. Ferrell qualified for this class based on his vertigo symptoms and the vertical nystagmus on the initial VNG. Dr. Studtmann also stated he reported difficulty walking and doing normal activities of daily living because he has dizziness. Class 2 requires a physical exam finding of unsteady gait and abnormal Romberg. He stated Mr. Ferrell had both. Lastly, Class 2 requires abnormal objective findings on VNG testing. As an evaluating physician, Dr. Studtmann stated he did not place or address permanent restrictions for Mr. Ferrell. However, he believed Mr. Ferrell could not return to truck driving.

On cross examination, Dr. Studtmann testified the only test he performed at the evaluation was an audiogram that showed high frequency hearing loss, but it was unrelated to the work injury. He revised his testimony regarding his physical exam of Mr. Ferrell. He testified it was a normal exam except for Mr. Ferrell's inability to do some gait testing and he swayed during his Romberg test, which is where you stand with your eyes closed.

Dr. Studtmann acknowledged that Mr. Ferrell's peripheral nystagmus from the inner ear injury from the initial VNG test resolved during treatment. Dr. Studtmann also tested his eyes and confirmed no signs of nystagmus. He found no neurologic dysfunction. He believed Mr. Ferrell's back and neck injuries were exacerbating his vertigo. Mr. Ferrell reported to Dr. Studtmann that he was taking Seroquel, which he agreed can cause drowsiness and dizziness. He also reported taking Xanax, which Dr. Studtmann acknowledged can cause dizziness and balance problems but stated it could also be used to treat those issues. He agreed that the combination of both medications could cause dizziness and balance issues. It could cause abnormal testing on VNG. Regarding Mr. Ferrell's cane-usage, Dr. Studtmann was not aware of anyone prescribing a cane.

### c. Back injury

For the denied back injury, WNL relied on Dr. Brophy's testimony. Mr. Ferrell introduced the deposition of Dr. Raymond Gardocki, an orthopedic spine surgeon, who treated Mr. Ferrell's back and provided the only impairment opinion for the back. It was undisputed that if Mr. Ferrell's back injury is compensable, he would be entitled to an additional period of 24.8 weeks of TTD benefits from February 13, 2017, to August 4,

2017.[2]

*Dr. Brophy*

Dr. Brophy initially provided some authorized treatment for Mr. Ferrell's back complaints before he concluded that his L4-5 HNP was unrelated to his work injury. He testified Mr. Ferrell reported back complaints at the emergency room on the accident date and to him beginning with his first visit of July 11, 2015. Dr. Brophy diagnosed lumbar myofascial pain associated with lumbar spondylosis and ordered physical therapy.

On September 2, Mr. Ferrell additionally complained of left lower extremity pain, which he indicated began several weeks before the visit. Dr. Brophy ordered a lumbar MRI, which showed a L4-5 HNP displacing the L5 nerve root with disc material extending into the L4 foramen without definite evidence of L4 nerve root compression. Dr. Brophy determined his onset of leg pain was likely related to his L4-5 herniated disc; however, he concluded the radiculopathy was not related to his July work injury. Dr. Brophy explained that people over forty can have incidental herniated discs. He stated, "The issue really is when did it become symptomatic, manifested by significant leg pain in the distribution of a specific nerve; and the first time it was mentioned was weeks after the accident, and, therefore, I would not consider it specifically related to the work injury."

Mr. Ferrell continued to report back symptoms to Dr. Brophy; however, based on his causation opinion, WNL denied further treatment for his back, and Mr. Ferrell saw Dr. Gardocki.

*Dr. Gardocki*

Mr. Ferrell gave Dr. Gardocki a history of his work injury and reported back and left leg pain. He informed Dr. Gardocki of his back surgery at L5-S1 twenty-six years before this injury but stated he had no problems requiring treatment or interfering with work until the injury.

On exam, Dr. Gardocki found significant left lower-extremity weakness and quadriceps weakness with atrophy. He reviewed Mr. Ferrell's MRI study and noted his broad-based L4-5 HNP. He initially ordered an injection and EMG/nerve conduction study. Following those tests, Dr. Gardocki was uncertain Mr. Ferrell was a surgical candidate and recommended a second opinion. Mr. Ferrell returned to Dr. Gardocki following a second opinion with Dr. Alice Cherqui, who recommended a discectomy at L4-5. Ultimately, Dr. Gardocki performed surgery at L4-5 on May 24, 2017. He clarified that Mr. Ferrell's L4-5 injury was not the same level as Mr. Ferrell's pre-existing injury

---

[2] Mr. Ferrell's counsel corrected the dates in the parties' joint pre-hearing statement under contested issue number eight. He clarified that if Mr. Ferrell's back injury is deemed compensable, he would be entitled to additional TTD for his back injury through August 4, 2017 for a total of 24.8 weeks, based on Dr. Gardocki's testimony. WNL did not object or dispute the requested period.

9

but was a level above. Following surgery, Dr. Gardocki testified Mr. Ferrell responded well with improvement in his leg pain and strength. He stated Mr. Ferrell had persistent back pain, but his nerve symptoms improved. He testified the purpose of the surgery was to improve the nerve pain and weakness in his leg.

After six months of follow-up treatment, Dr. Gardocki ordered a functional capacity evaluation (FCE) to assess his functional abilities. He testified the FCE indicated Mr. Ferrell could safely work in the light to medium workload category. Based on Mr. Ferrell's subjective description of his commercial driving, the evaluators determined he demonstrated less tolerance than required of the truck-driving job demands. Dr. Gardocki testified he relied on the FCE results and adopted their findings as permanent restrictions. He testified Mr. Ferrell reached MMI for his back injury on February 20, 2018. Dr. Gardocki stated Mr. Ferrell has returned once since MMI and his strength had returned in his legs from having diffuse weakness and quad atrophy to normal strength. He concluded this finding indicated Mr. Ferrell's surgery helped.

Regarding causation, Dr. Gardocki causally related Mr. Ferrell's L4-5 HNP to his work injury within a reasonable degree of medical certainty. He believed the left leg pain came from the L4-5 HNP. Dr. Gardocki's testimony regarding the timing of Mr. Ferrell's radicular symptoms in the leg differed from Dr. Brophy's. On cross examination, counsel asked Dr. Gardocki if he would expect symptoms of impingement on a nerve to occur simultaneously with a traumatic disc herniation like Mr. Ferrell's. Dr. Gardocki responded that it can. However, when counsel asked if impingement symptoms were more likely to occur immediately versus over a period of time, he responded, "[The impingement symptoms] could progress, it can improve, and it could stay constant."

Regarding impairment, Dr. Gardocki assigned a seven percent permanent impairment to the body for the back injury based on the AMA Guides. He further testified Mr. Ferrell's treatment and bills incurred at the Campbell Clinic ($4,618), with Dr. Cherqui ($263.00), and the EMG/NCS with Dr. Ronald Bingham ($670.00) were reasonable and necessary for his back injury.

## Findings of Fact and Conclusions of Law

At a Compensation Hearing, the employee must establish by a preponderance of the evidence that he or she is entitled to the requested benefits. *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2018).

*Compensability of back injury*

To prove a compensable injury, Mr. Ferrell must prove "to a reasonable degree of medical certainty that [the injury] contributed more than fifty percent (50%) in causing the death, disablement or need for medical treatment, considering all causes." *See* Tenn.

10

Code Ann. § 50-6-102(14)(B). The term "reasonable degree of medical certainty" means that "in the opinion of the physician, it is more likely than not considering all causes, as opposed to speculation or possibility." *See* Tenn. Code Ann. §50-6-102(14)(D). Thus, causation must be established by expert medical testimony.

In denying compensability for Mr. Ferrell's L4-5 HNP, WNL relied on Dr. Brophy's opinion that it was unrelated based on the timeline of Mr. Ferrell's reported onset of left leg symptoms. As the authorized treating physician, Dr. Brophy's causation opinion is afforded a rebuttable statutory presumption of correctness. The issue before the Court is whether Mr. Ferrell, through Dr. Gardocki's testimony, successfully rebutted the presumption afforded Dr. Brophy's opinion by a preponderance of the evidence. The Court finds he did.

In so finding, the Court notes Mr. Ferrell consistently registered various back complaints to his medical providers from the date of the work injury. After Dr. Brophy reviewed Mr. Ferrell's MRI, which showed a broad-based L4-5 disc herniation with disc material extending into the L4 foramen, he acknowledged that Mr. Ferrell's left leg symptoms were consistent with and caused by that L4-5 herniation. However, he concluded the L4-5 herniation did not arise out of the work injury because Mr. Ferrell did not specifically report leg symptoms to him until September 2 and indicated the symptoms began several weeks before the visit. However, based on the timeline referenced by Dr. Brophy, Mr. Ferrell's leg symptoms began within three to four weeks of his July 11 work injury.

In contrast, Dr. Gardocki directly related Mr. Ferrell's L4-5 HNP to his work injury. He considered Mr. Ferrell's L4-5 HNP a traumatic herniation. Regarding the timeline of the onset of his leg symptoms, he testified that while impingement symptoms, like leg pain, can immediately accompany a traumatic herniation, they don't have to. He indicated that following a traumatic herniation, impingement symptoms could progress, improve, or stay constant. The Court finds his causation opinion was further supported by his testimony, which indicated he considered Mr. Ferrell's preexisting back injury at L5-S1 but said Mr. Ferrell's symptoms and treatment were not at that level but at the level above.

"When faced with conflicting medical testimony, the Court must use its discretion in accepting one expert opinion over another and, in so doing, may consider which opinion contains the more probable explanation." *Sanker v. Nacarato Trucks, Inc.,* 2016 TN Wrk. Comp. App. Bd. LEXIS 27, at *12 (July 6, 2016). Here, based on Mr. Ferrell's testimony regarding his back condition combined with the medical proof, the Court finds Dr. Gardocki offered the more probable and persuasive explanation and holds Mr. Ferrell sustained a compensable back injury.

Regarding future medical care, the Court finds Mr. Ferrell justifiably sought

11

treatment on his own after WNL denied his back injury, and it would be unfair to require him to change providers at this stage. Accordingly, the Court holds WNL shall provide Mr. Ferrell future medical treatment for his back injury and designates Dr. Gardocki as the authorized physician. *See Ducros v. Metro Roofing and Metal Supply Co., Inc.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 62, at *11 (Oct. 17. 2017).

*Permanent Medical Impairment*

*Back*

In addition to finding Mr. Ferrell sustained a compensable L4-5 back injury, the Court accepts Dr. Gardocki's testimony that Mr. Ferrell sustained a seven percent permanent impairment to the body as a whole for his back injury.

*Neck*

Turning to the accepted neck injury, the Court considers the competing impairment opinions of Drs. Brophy and Chung. Dr. Brophy assigned a six percent impairment based on Class 1, Table 17-2 of the AMA Guides, which required documented resolved radiculopathy or nonverifiable radicular complaints at the time of exam. Dr. Chung assigned an eleven percent impairment based on Class 2 of the same table, which required residual radiculopathy. As the treating physician, Dr. Brophy's impairment opinion is afforded a rebuttable presumption of correctness. Here, upon thorough consideration of the medical testimony, the Court finds Mr. Ferrell did not successfully rebut the presumption afforded Dr. Brophy's impairment opinion.

In so finding, the Court considers that Dr. Brophy testified he assigned a Class 1 impairment because Mr. Ferrell had no weakness and no numbness at his last visit. He convincingly disputed Dr. Chung's basis for assigning a Class 2 impairment stating, "[h]e considered a positive Spurling sign on the left side of the neck which is subjective, decreased reflexes, which I did not find except they were symmetric, sensory loss in the specific left cervical dermatome, which he did not have when I last saw him." Dr. Brophy further disagreed with Dr. Chung's finding of motor deficits and stated he never found weakness after many months of treatment. Notably, when Mr. Ferrell returned to Dr. Brophy after MMI, with new symptoms in his fourth and fifth fingers, Dr. Brophy testified he still exhibited *no* symptoms of recurrent left upper extremity radicular pain. Finally, Dr. Brophy testified, "if he had weakness in a C6 distribution, that would put him in Class 2; but he never had that pre-op, never had it post-op . . ." The Court finds Dr. Brophy's testimony compelling and is persuaded that Mr. Ferrell qualifies for a Class 1 impairment rating based on his exam findings on multiple visits. Thus, the Court holds Mr. Ferrell sustained a six percent permanent impairment to the body for his neck injury.

*Inner-Ear*

12

The Court next considers the competing impairment opinions of Dr. Hall and Dr. Studtmann for the inner-ear injury. Dr. Hall assigned a zero percent impairment rating under Table 11-4 of the Guides, based on Mr. Ferrell's normal VNG test findings at his last visit and Dr. Hall's conclusion that Mr. Ferrell had normal vestibular function. In contrast, Dr. Studtmann assigned twenty-percent impairment based on the same table. The parties agreed that as the authorized treating physician, Dr. Hall's impairment opinion is afforded a rebuttable presumption of correctness. The issue is whether Mr. Ferrell, through Dr. Studtmann's testimony, overcame the presumption of correctness afforded Dr. Hall's opinion. For the following reason, the Court finds he did not.

WNL argued, and the Court agrees, that Dr. Studtmann did not follow the directives of the AMA Guides in assigning his impairment rating. To qualify for a Class 2 impairment rating in Table 11-4, there must be abnormal findings on VNG testing. In support of his rating, Dr. Studtmann testified Mr. Ferrell qualified for Class 2 because of his abnormal VNG. However, the medical proof was clear that Mr. Ferrell's only abnormal VNG test was his initial test *before* treatment. Dr. Hall testified that Mr. Ferrell had two subsequent normal VNGs, including a normal test on his last visit. Dr. Studtmann did not perform VNG testing at his evaluation and, with the exception of Romberg testing, even his own examination of Mr. Ferrell was normal.

In summary, the Court finds Dr. Studtmann's findings do not support his conclusion. Consequently, the Court finds Mr. Ferrell did not successfully overcome the presumption of correctness afforded Dr. Hall's impairment opinion and holds Mr. Ferrell retained a zero percent anatomic impairment for the inner-ear vestibular injury.

*Compensation Rate*

WNL employed Mr. Ferrell for five weeks before the accident, some of which were not full weeks. The Court finds Mr. Ferrell did not have sufficient earnings to adequately determine his average weekly wage. Where employment was brief and the average weekly wage cannot be determined by the injured employee's earnings, it is based on the income of a person in the same grade and employed in the same work as employee. *See* Tenn. Code Ann. §50-6-102(3)(C).

Mr. Ferrell argued several different ways to fairly reach a compensation rate. WNL argued Mr. Ferrell's average weekly wage should be based on the *average* of Mr. Adkisson's wages and Mr. Rainey's wages. The Court disagrees. The undisputed proof indicated Mr. Adkisson intentionally worked less to make less wages to not impact his Social Security Retirement benefits and should not be considered when determining Mr. Ferrell's compensation rate. Based on the testimony of both Mr. Ferrell and Mr. Norris, the Court finds Mr. Rainey was a person in the same grade and employed in the same work and based on his wage statement, the Court holds Mr. Ferrell's average weekly wage is $658.62 and his compensation rate is $439.10.

13

*Permanent Disability*

Mr. Ferrell seeks permanent total disability (PTD) benefits. Tennessee Code Annotated section 50-6-207(4)(B) provides: "When an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled[.]"

In considering Mr. Ferrell's request, the Court is guided by the Appeals Board, which wrote:

> In assessing whether an employee is permanently totally disabled, courts consider a number of factors to ascertain "a complete picture of an individual's ability to return to gainful employment." These factors include the employee's skills, education, age, training, and "job opportunities in the immediate and surrounding communities, and the availability of work suited for an individual with that particular disability." Also, "an employee's own assessment of his or her overall physical condition, including the ability or inability to return to gainful employment, is competent testimony that should be considered.

*Duwan Duignan v. Stowers Machinery Corporation, et al.*, 2018 TN Wrk. Comp. App. Bd. LEXIS 25, at *10-11 (May 29, 2018), (internal citations omitted). Guided by these principles, the Court finds Mr. Ferrell did not establish permanent and total disability.

First, the Court considers Mr. Ferrell's skills, education, age, and training. Mr. Ferrell is fifty-nine years old with a GED. He worked for years as a truck driver; however, his work history demonstrated he developed skills beyond commercial driving. He is self-taught on computers and even without formal training, he was able to work in a computer store and perform freelance work on computers. Dr. Brophy testified Mr. Ferrell extensively discussed his computer skills, his activities writing programs at home, and his plans to attend an advanced computer course or seek future work in computers. Mr. Ferrell also developed management skills in an office setting for a trucking company. In that position, he did paperwork, managed loads and drivers, maintained DOT certifications, dispatched drivers and loads, and conducted safety training for the drivers.

Mr. Ferrell testified he would be unable to return to commercial driving because of the physical demands of the job and was unable to renew his commercial driver's license because he could not pass the physical. Mr. Ferrell did not believe he could perform any of his prior jobs based on his dizziness, difficulty sitting for long periods of time, and trouble lifting heavy items. He admitted he has not applied for any other employment since his termination from WNL.

The Court further considers that neither Dr. Brophy nor Dr. Hall assigned any

14

permanent work restrictions for Mr. Ferrell based on his neck or inner-ear vestibular injuries. Significantly, the only objective evaluation regarding Mr. Ferrell's abilities was the FCE ordered by Dr. Gardocki. Dr. Gardocki considered the FCE a valid study and adopted the FCE findings as restrictions for the back injury. The FCE indicated Mr. Ferrell could safely work in the light to medium workload category. While not determinative, no expert vocational proof was introduced at trial, which could have addressed Mr. Ferrell's "job opportunities in the immediate and surrounding communities, and the availability of work suited for an individual with that particular disability."

Based on the foregoing and particularly the FCE findings, the Court concludes that Mr. Ferrell did not establish by a preponderance of the evidence that he is *totally* incapacitated from working at *any* job that brings an income. Thus, the Court denies Mr. Ferrell's claim for permanent total disability benefits.

*Permanent Partial Disability Benefits*

Since Mr. Ferrell is not entitled to permanent total benefits, the Court must determine the extent of permanent partial disability (PPD) to which he is entitled. The assessment of PPD occurs at two different times. The first assessment takes place once the treating physician places the injured employee at MMI and assigns an impairment rating. Based on the Court's above findings regarding Mr. Ferrell's permanent impairment for his neck and back, the Court finds he has a combined anatomic rating of thirteen percent to the body, which entitles him to 58.5 weeks of benefits.[3] Thus, Mr. Ferrell's original award is $25,687.35.[4]

The second assessment of PPD benefits occurs at the expiration of the initial compensation period. Based on the Court's finding of a combined thirteen percent permanent impairment and Mr. Ferrell's MMI date of February 20, 2018, Mr. Ferrell's initial compensation period expires on April 5, 2019. If, at that time, he has not returned to work with any employer or has returned to work and is receiving wages less than his pre-injury wages, he may qualify for a resulting award and increased benefits. *See* Tenn. Code Ann. § 50-6-207(3)(B). Because Mr. Ferrell's initial compensation period has not expired, the Court cannot determine his entitlement to increased benefits at this time.

---

[3] The Court takes judicial knowledge of the Guides and specifically the Combined Values Chart on page 604 of the Guides, which the Court attaches as an appendix to this order. Simply applied, Mr. Ferrell's neck and back impairment ratings combine to a total rating of thirteen percent to the body. "The Guidelines having been incorporated into the Workers' Compensation Statute, T.C.A. § 50-6-204(d)(3), the Court can take judicial knowledge of the provisions." *Smith v. Liberty Mut. Ins. Co.,* No. 01S01-9408-CH-00079, 1995 Tenn. LEXIS 276, at *3 (Tenn. Workers' Comp. Panel May 31, 1995).

[4] 450 weeks x 13%= 58.5 weeks x $439.10= $25,687.35.

*Temporary Disability and Medical Bills*

Mr. Ferrell requested additional TTD benefits for the eighty-four weeks he was paid at the disputed rate of $402.23. He further requested additional TTD for 24.8 weeks, the period he treated with Dr. Gardocki for his back injury. As stated above, the Court finds Mr. Ferrell's compensation rate is $439.10; thus, he is entitled to additional TTD of $3,097.08 for the underpayment of TTD and $10,889.68 while treating for his back injury. The total TTD award is $13,986.76.

Regarding the past medical bills, the Court finds Mr. Ferrell established by a preponderance of the evidence that his medical bills incurred for treatment of his back injury were reasonable and necessary. Thus, WNL shall satisfy Mr. Ferrell's outstanding balances owed to the following providers: Campbell Clinic ($4,618), Dr. Alice Cherqui ($263.00), and Dr. Ronald Bingham ($670.00). Further, the Court finds Bolivar-Hardeman County Ambulance Service was called to Mr. Ferrell's accident scene and provided some onsite care for his work injuries. Thus, WNL shall satisfy the ambulance bill of $300.

*Discretionary Costs*

As the prevailing party, Mr. Ferrell's counsel submitted a motion and affidavit regarding discretionary costs under Rule 54 of the Tennessee Rules of Civil Procedure. He outlined the following costs:

| | |
|---|---|
| Deposition fee of Dr. Samuel Chung | $750.00 |
| Court reporter fee for Dr. Chung's transcript | $169.75 |
| Court reporter fee for Plaintiff's deposition transcript | $231.00 |
| Deposition fee of Dr. Karl Studtmann | $1,250.00 |
| Court reporter fee for Dr. Studtmann's transcript | $134.55 |
| Deposition fee of Dr. Raymond Gardocki | $750.00 |
| Court reporter fee for Dr. Gardocki's transcript | $259.00 |
| Court reporter fee for Dr. Brophy's transcript | $167.10 |
| Court reporter fee for Dr. Hall's transcript | $189.50 |

Rule 54.04(2) provides recovery for reasonable and necessary "court reporter expenses for depositions" and "expert witness fees for depositions." *See Garassino v. Western Express, Inc.*, No. M2016-02431-SC-R3-WC, 2018 Tenn. LEXIS 60, at *8-9 (Tenn. Workers' Comp. Panel Feb. 8, 2018). In *Garassino*, the Panel cited Tennessee Code Annotated section 50-6-239(c)(8) which authorizes a trial court, in its discretion, to "assess discretionary costs including reasonable fees for depositions of medical experts against the employer upon adjudication of the employee's claim as compensable." Here, in light of the Court's decision that Mr. Ferrell did not successfully rebut the presumption of correctness afforded to Dr. Brophy regarding permanent impairment for the neck and to Dr. Hall regarding impairment for the inner-ear injury, the Court, in its discretion,

16

denies the request for costs associated with Dr. Chung's and Dr. Studtmann's depositions. The Court holds WNL shall pay discretionary costs of $1,596.60.

Finally, the Court holds Mr. Ferrell's attorney is entitled to a reasonable attorney's fee. The statute provides attorney's fees shall be deemed reasonable if the fee "does not exceed twenty percent (20%) of the award to the injury worker." Tenn. Code Ann. §50-6-226 (2018). Thus, the Court holds Mr. Ferrell's counsel is entitled to a twenty-percent fee.

**IT IS, THEREFORE, ORDERED** as follows:

1. Wade Norris Logging, or its insurance carrier, shall pay permanent partial disability benefits representing Mr. Ferrell's original award of $25,687.35, minus a PPD advance credit of $2,585.90.

2. Wade Norris Logging, or its insurance carrier, shall pay Mr. Ferrell additional TTD benefits of $13,986.76.

3. Wade Norris Logging, or its insurance carrier, shall satisfy Mr. Ferrell's outstanding past medical bills owed to Campbell Clinic, Dr. Cherqui, Dr. Bingham, and Bolivar-Hardeman County Ambulance Service, as provided in this order.

4. Mr. Ferrell shall receive future medical benefits under the statute for his neck, inner-ear, and back injuries. The Court designates Dr. Gardocki as his authorized treating physician for his back injury.

5. Mr. Ferrell's attorney is awarded a twenty-percent attorney's fee to be paid from his award.

6. Wade Norris Logging shall pay Mr. Ferrell's discretionary costs of $1,596.60.

7. Costs of $150.00 are assessed against Wade Norris Logging under Tennessee Compilation Rules and Regulations 0800-02-21-.07 (2018), to be paid within five days of this order becoming final. Wade Norris Logging shall prepare and file a statistical data form (SD2) within ten business days of the date of this order under Tennessee Code Annotated section 50-6-244.

8. Absent an appeal of this order, it shall become final thirty days after issuance.

**ENTERED** this 13th day of March, 2019.

**JUDGE AMBER E. LUTTRELL**
**Court of Workers' Compensation Claims**

## APPENDIX

**\*AMA Guides' Combined Values Chart**

Technical Record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Scheduling Hearing
4. Scheduling Order
5. Order Granting Defendant's Motion to Extend Medical Expert Deadline
6. Order Granting Employee's Motion to Extend Post Discovery Mediation
7. Employee's Witness and Exhibit List
8. Employee's Trial Brief
9. Employee's Motion to Assess Discretionary Costs
10. Employee's Verified Bill of Costs
11. Employer's Exhibits and Expert Witness List
12. Employer's Pre-Trial Brief
13. Dispute Certification Notice (post-discovery ADR)
14. Joint Pre-Compensation Hearing Statement
15. Order Granting Continuance of Compensation Hearing

Exhibits:
1. Dr. Brophy's deposition
2. Dr. Gardocki's deposition
3. Dr. Hall's deposition
4. Dr. Studtmann's deposition
5. Dr. Chung's deposition
6. Mr. Ferrell's wage statement
7. Mr. Ferrell's W-2
8. Photos (collective exhibit-3 pages)
9. Hardeman County Ambulance Service bill
10. Separation Notice
11. Wage statement of similar employee- Larry Adkisson
12. Wage statement of similar employee- Greg Rainey
13. First Report of Injury

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Order was sent to the following recipients by the following methods of service on March 13, 2019.

| Name | Via Email | Service sent to: |
|---|---|---|
| David Hardee, Esq., Employee's Attorney | X | kperry@hmdlaw1.com |
| Jeff Foster, Esq., Employer's Attorney | X | jfoster@morganakins.com |

**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**

**SIXTH EDITION**

# Guides to the Evaluation of Permanent Impairment

**Medical Editor**

**Robert D. Rondinelli, MD, PhD**
Medical Director of Rehabilitation Services
Iowa Health Des Moines
Des Moines, Iowa

**Section Editors**

**Elizabeth Genovese MD, MBA, FACOEM, FAADEP**
IMX Medical Management Services
Bala Cynwyd, Pennsylvania

**Richard T. Katz, MD**
Physical Medicine & Rehabilitation
St. Louis, Missouri

**Tom G. Mayer, MD**
Productive Rehabilitation Institute of Dallas for Ergonomics (PRIDE)
Dallas, Texas

**Kathryn L. Mueller, MD, MPH**
University of Colorado Health Sciences Center
Denver, Colorado

**Mohammed I. Ranavaya, MD, JD, MS, FFOM, FRCPI, CIME**
Professor and Chief, Division of Occupational and Disability Medicine
Marshall University, Joan C. Edwards School of Medicine
Huntington, West Virginia

**Senior Contributing Editor**

**Christopher R. Brigham, MD, MMS**
Brigham and Associates, Inc.
San Diego, California



AMA
AMERICAN
MEDICAL
ASSOCIATION

# Appendix A. Combined Values Chart

The values are derived from the formula $A + B(1-A)$ = combined value of A and B, where A and B are the decimal equivalents of the impairment ratings. In the chart all values are expressed as percents. To combine any two impairment values, locate the larger of the values on the side of the chart and read along that row until you come to the column indicated by the smaller value at the bottom of the chart. At the intersection of the row and the column is the combined value.

For example, to combine 35% and 20%, read down the side of the chart until you come to the larger value, 35%. Then read across the 35% row until you come to the column indicated by 20% at the bottom of the chart. At the intersection of the row and column is the number 48. Therefore, 35% combined with 20% is 48%. Because of the construction of this chart, the larger impairment value must be identified at the side of the chart.

If three or more impairment values are to be combined, select any two and find their combined value as above. Then use that value and the third value to locate the combined value of all. This process can be repeated indefinitely, the final value in each instance being the combination of all the previous values. In each step of this process the larger impairment value must be identified at the side of the chart.

*Note:* If impairments from two or more organ systems are to be *combined* to express a whole person impairment, each must first be expressed as a whole person impairment percent.

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1** | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **2** | 3 | 4 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **3** | 4 | 5 | 6 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **4** | 5 | 6 | 7 | 8 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **5** | 6 | 7 | 8 | 9 | 10 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **6** | 7 | 8 | 9 | 10 | 11 | 12 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **7** | 8 | 9 | 10 | 11 | 12 | 13 | 14 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **8** | 9 | 10 | 11 | 12 | 13 | 14 | 14 | 15 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **9** | 10 | 11 | 12 | 13 | 14 | 14 | 15 | 16 | 17 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **10** | 11 | 12 | 13 | 14 | 15 | 15 | 16 | 17 | 18 | 19 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **11** | 12 | 13 | 14 | 15 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **12** | 13 | 14 | 15 | 16 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **13** | 14 | 15 | 16 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 23 | 24 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **14** | 15 | 16 | 17 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 23 | 24 | 25 | 26 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **15** | 16 | 17 | 18 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 28 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **16** | 17 | 18 | 19 | 19 | 20 | 21 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 28 | 29 | 29 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **17** | 18 | 19 | 19 | 20 | 21 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 28 | 29 | 29 | 30 | 31 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **18** | 19 | 20 | 20 | 21 | 22 | 23 | 24 | 25 | 25 | 26 | 27 | 28 | 29 | 29 | 30 | 31 | 32 | 33 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **19** | 20 | 21 | 21 | 22 | 23 | 24 | 25 | 25 | 26 | 27 | 28 | 29 | 30 | 30 | 31 | 32 | 33 | 34 | 34 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **20** | 21 | 22 | 22 | 23 | 24 | 25 | 26 | 26 | 27 | 28 | 29 | 30 | 30 | 31 | 32 | 33 | 34 | 34 | 35 | 36 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **21** | 22 | 23 | 23 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 30 | 31 | 32 | 33 | 34 | 34 | 35 | 36 | 37 | 38 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **22** | 23 | 24 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 31 | 31 | 32 | 33 | 34 | 34 | 35 | 36 | 37 | 38 | 38 | 39 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **23** | 24 | 25 | 25 | 26 | 27 | 28 | 28 | 29 | 30 | 31 | 31 | 32 | 33 | 34 | 35 | 35 | 36 | 37 | 38 | 38 | 39 | 40 | 41 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **24** | 25 | 26 | 26 | 27 | 28 | 29 | 29 | 30 | 31 | 32 | 32 | 33 | 34 | 35 | 35 | 36 | 37 | 38 | 38 | 39 | 40 | 41 | 41 | 42 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **25** | 26 | 27 | 27 | 28 | 29 | 30 | 30 | 31 | 32 | 33 | 33 | 34 | 35 | 36 | 36 | 37 | 38 | 39 | 39 | 40 | 41 | 42 | 42 | 43 | 44 | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **26** | 27 | 27 | 28 | 29 | 30 | 30 | 31 | 32 | 33 | 33 | 34 | 35 | 36 | 36 | 37 | 38 | 39 | 39 | 40 | 41 | 42 | 42 | 43 | 44 | 45 | 45 | | | | | | | | | | | | | | | | | | | | | | | | | |
| **27** | 28 | 28 | 29 | 30 | 31 | 31 | 32 | 33 | 34 | 34 | 35 | 36 | 36 | 37 | 38 | 39 | 39 | 40 | 41 | 42 | 42 | 43 | 44 | 45 | 45 | 46 | 47 | | | | | | | | | | | | | | | | | | | | | | | | |
| **28** | 29 | 29 | 30 | 31 | 32 | 32 | 33 | 34 | 34 | 35 | 36 | 37 | 37 | 38 | 39 | 40 | 40 | 41 | 42 | 42 | 43 | 44 | 45 | 45 | 46 | 47 | 47 | 48 | | | | | | | | | | | | | | | | | | | | | | | |
| **29** | 30 | 30 | 31 | 32 | 33 | 33 | 34 | 35 | 35 | 36 | 37 | 38 | 38 | 39 | 40 | 40 | 41 | 42 | 42 | 43 | 44 | 45 | 45 | 46 | 47 | 47 | 48 | 49 | 50 | | | | | | | | | | | | | | | | | | | | | | |
| **30** | 31 | 31 | 32 | 33 | 34 | 34 | 35 | 36 | 36 | 37 | 38 | 38 | 39 | 40 | 41 | 41 | 42 | 43 | 43 | 44 | 45 | 45 | 46 | 47 | 48 | 48 | 49 | 50 | 50 | 51 | | | | | | | | | | | | | | | | | | | | |
| **31** | 32 | 32 | 33 | 34 | 34 | 35 | 36 | 37 | 37 | 38 | 39 | 39 | 40 | 41 | 41 | 42 | 43 | 43 | 44 | 45 | 45 | 46 | 47 | 48 | 48 | 49 | 50 | 50 | 51 | 52 | 52 | | | | | | | | | | | | | | | | | | | |
| **32** | 33 | 33 | 34 | 35 | 35 | 36 | 37 | 37 | 38 | 39 | 39 | 40 | 41 | 42 | 42 | 43 | 44 | 44 | 45 | 46 | 46 | 47 | 48 | 48 | 49 | 50 | 50 | 51 | 52 | 52 | 53 | 54 | | | | | | | | | | | | | | | | | | |
| **33** | 34 | 34 | 35 | 36 | 36 | 37 | 38 | 38 | 39 | 40 | 40 | 41 | 42 | 42 | 43 | 44 | 44 | 45 | 46 | 46 | 47 | 48 | 48 | 49 | 50 | 50 | 51 | 52 | 52 | 53 | 54 | 54 | 55 | | | | | | | | | | | | | | | | | |
| **34** | 35 | 35 | 36 | 37 | 37 | 38 | 39 | 39 | 40 | 41 | 41 | 42 | 43 | 43 | 44 | 45 | 45 | 46 | 47 | 47 | 48 | 49 | 49 | 50 | 51 | 51 | 52 | 52 | 53 | 54 | 54 | 55 | 56 | 56 | | | | | | | | | | | | | | | | |
| **35** | 36 | 36 | 37 | 38 | 38 | 39 | 40 | 40 | 41 | 42 | 42 | 43 | 43 | 44 | 45 | 45 | 46 | 47 | 47 | 48 | 49 | 49 | 50 | 51 | 51 | 52 | 53 | 53 | 54 | 55 | 55 | 56 | 56 | 57 | 58 | | | | | | | | | | | | | | | |
| **36** | 37 | 37 | 38 | 39 | 39 | 40 | 40 | 41 | 42 | 42 | 43 | 44 | 44 | 45 | 46 | 46 | 47 | 48 | 48 | 49 | 49 | 50 | 51 | 51 | 52 | 53 | 53 | 54 | 55 | 55 | 56 | 56 | 57 | 58 | 58 | 59 | | | | | | | | | | | | | | |
| **37** | 38 | 38 | 39 | 40 | 40 | 41 | 41 | 42 | 43 | 43 | 44 | 45 | 45 | 46 | 46 | 47 | 48 | 48 | 49 | 50 | 50 | 51 | 51 | 52 | 53 | 53 | 54 | 55 | 55 | 56 | 57 | 57 | 58 | 58 | 59 | 60 | 60 | | | | | | | | | | | | | |
| **38** | 39 | 39 | 40 | 40 | 41 | 42 | 42 | 43 | 44 | 44 | 45 | 45 | 46 | 47 | 47 | 48 | 49 | 49 | 50 | 50 | 51 | 52 | 52 | 53 | 54 | 54 | 55 | 55 | 56 | 57 | 57 | 58 | 58 | 59 | 60 | 60 | 61 | 62 | | | | | | | | | | | | |
| **39** | 40 | 40 | 41 | 41 | 42 | 43 | 43 | 44 | 44 | 45 | 46 | 46 | 47 | 48 | 48 | 49 | 49 | 50 | 51 | 51 | 52 | 52 | 53 | 54 | 54 | 55 | 55 | 56 | 57 | 57 | 58 | 59 | 59 | 60 | 60 | 61 | 62 | 62 | 63 | | | | | | | | | | | |
| **40** | 41 | 41 | 42 | 42 | 43 | 44 | 44 | 45 | 45 | 46 | 47 | 47 | 48 | 48 | 49 | 50 | 50 | 51 | 51 | 52 | 53 | 53 | 54 | 54 | 55 | 56 | 56 | 57 | 57 | 58 | 59 | 59 | 60 | 60 | 61 | 62 | 62 | 63 | 63 | 64 | | | | | | | | | | |
| **41** | 42 | 42 | 43 | 43 | 44 | 45 | 45 | 46 | 46 | 47 | 47 | 48 | 49 | 49 | 50 | 50 | 51 | 52 | 52 | 53 | 53 | 54 | 55 | 55 | 56 | 56 | 57 | 58 | 58 | 59 | 59 | 60 | 60 | 61 | 62 | 62 | 63 | 63 | 64 | 65 | 65 | | | | | | | | | |
| **42** | 43 | 43 | 44 | 44 | 45 | 45 | 46 | 47 | 47 | 48 | 48 | 49 | 50 | 50 | 51 | 51 | 52 | 52 | 53 | 54 | 54 | 55 | 55 | 56 | 57 | 57 | 58 | 58 | 59 | 59 | 60 | 61 | 61 | 62 | 62 | 63 | 63 | 64 | 65 | 65 | 66 | 66 | | | | | | | | |
| **43** | 44 | 44 | 45 | 45 | 46 | 46 | 47 | 48 | 48 | 49 | 49 | 50 | 50 | 51 | 52 | 52 | 53 | 53 | 54 | 54 | 55 | 56 | 56 | 57 | 57 | 58 | 58 | 59 | 60 | 60 | 61 | 61 | 62 | 62 | 63 | 64 | 64 | 65 | 65 | 66 | 66 | 67 | 68 | | | | | | | |
| **44** | 45 | 45 | 46 | 46 | 47 | 47 | 48 | 48 | 49 | 50 | 50 | 51 | 51 | 52 | 52 | 53 | 54 | 54 | 55 | 55 | 56 | 56 | 57 | 57 | 58 | 59 | 59 | 60 | 60 | 61 | 61 | 62 | 62 | 63 | 64 | 64 | 65 | 65 | 66 | 66 | 67 | 68 | 68 | 69 | | | | | | |
| **45** | 46 | 46 | 47 | 47 | 48 | 48 | 49 | 49 | 50 | 51 | 51 | 52 | 52 | 53 | 53 | 54 | 54 | 55 | 55 | 56 | 57 | 57 | 58 | 58 | 59 | 59 | 60 | 60 | 61 | 62 | 62 | 63 | 63 | 64 | 64 | 65 | 65 | 66 | 66 | 67 | 68 | 68 | 69 | 69 | 70 | | | | | |
| **46** | 47 | 47 | 48 | 48 | 49 | 49 | 50 | 50 | 51 | 51 | 52 | 52 | 53 | 54 | 54 | 55 | 55 | 56 | 56 | 57 | 57 | 58 | 58 | 59 | 60 | 60 | 61 | 61 | 62 | 62 | 63 | 63 | 64 | 64 | 65 | 65 | 66 | 67 | 67 | 68 | 68 | 69 | 69 | 70 | 70 | 71 | | | | |
| **47** | 48 | 48 | 49 | 49 | 50 | 50 | 51 | 51 | 52 | 52 | 53 | 53 | 54 | 54 | 55 | 55 | 56 | 57 | 57 | 58 | 58 | 59 | 59 | 60 | 60 | 61 | 61 | 62 | 62 | 63 | 63 | 64 | 64 | 65 | 66 | 66 | 67 | 67 | 68 | 68 | 69 | 69 | 70 | 70 | 71 | 71 | 72 | | | |
| **48** | 49 | 49 | 50 | 50 | 51 | 51 | 52 | 52 | 53 | 53 | 54 | 54 | 55 | 55 | 56 | 56 | 57 | 57 | 58 | 58 | 59 | 59 | 60 | 60 | 61 | 62 | 62 | 63 | 63 | 64 | 64 | 65 | 65 | 66 | 66 | 67 | 67 | 68 | 68 | 69 | 69 | 70 | 70 | 71 | 71 | 72 | 72 | 73 | | |
| **49** | 50 | 50 | 51 | 51 | 52 | 52 | 53 | 53 | 54 | 54 | 55 | 55 | 56 | 56 | 57 | 57 | 58 | 58 | 59 | 59 | 60 | 60 | 61 | 61 | 62 | 62 | 63 | 63 | 64 | 64 | 65 | 65 | 66 | 66 | 67 | 67 | 68 | 68 | 69 | 69 | 70 | 70 | 71 | 71 | 72 | 72 | 73 | 73 | 74 | |
| **50** | 51 | 51 | 52 | 52 | 53 | 53 | 54 | 54 | 55 | 55 | 56 | 56 | 57 | 57 | 58 | 58 | 59 | 59 | 60 | 60 | 61 | 61 | 62 | 62 | 63 | 63 | 64 | 64 | 65 | 65 | 66 | 66 | 67 | 67 | 68 | 68 | 69 | 69 | 70 | 70 | 71 | 71 | 72 | 72 | 73 | 73 | 74 | 74 | 75 | 75 |